# Joseph F. Iredell's Appeal.

A suitor, himself culpable, must, to entitle himself to equitable relief, make out against the defendant a case of oppression and late discovered conspiracy, of a serious character and by irrefutable evidence.

Where a partner, guilty of appropriating money of the firm by false entries in the books, is detected, employs counsel, and, upon settlement for a reduced amount, gives a general release under seal, he cannot, seven years afterward and without convincing proof, maintain a bill in equity to set aside the settlement and release, on the grounds of duress and conspiracy.

(Argued March 19, 1888. Decided April 23, 1888.)

January Term, 1887, No. 376, E. D., before GORDON, Ch. J., PAXSON, STERRETT, GREEN, CLARK, and WILLIAMS, JJ. Appeal from a decree of Common Pleas No. 3 of Philadelphia County dismissing a bill in equity, September Term, 1882, No. 492. Affirmed.

Reported below, Iredell v. Klemm, 3 Pa. Co. Ct. 137.

NOTE.—Where accounts have been stated between partners, they will not be reopened except for fraud, misrepresentation, or mistake. Varner's Appeal, 2 Monaghan (Pa.) 228, 16 Atl. 98; Bittenbender v. Kemmerer, 185 Pa. 135, 39 Atl. 838; Hartley v. Henderson, 189 Pa. 277, 42 Atl. 198. But it must appear that it is an account stated. McGinn v. Benner, 180 Pa 396, 36 Atl. 925; Seaton v. Shaner, 158 Pa. 69, 27 Atl. 871.

This was a bill filed by Joseph F. Iredell against William G. Klemm and John Klemm.

The plaintiff alleged in his bill that about March, 1872, he and the defendants entered into copartnership for the sale and purchase of notions, etc., at 25 North Third street, Philadelphia; that he kept the books; that in 1875 he had drawn $1,800 for his own use, the business warranting it; that in 1875 a plot or conspiracy was formed between the defendants to drive him out of the firm; that to that end an accountant was called in separately by the defendants to examine the books without his consent, and in violation of his rights; that the accounts were then speciously and fraudulently perverted, and certain moneys he had drawn, with the full knowledge of defendants, were then called by them fraudulent appropriations; that counsel was retained by defendants, and his advice, on the facts presented to him, was misstated to plaintiff, and he made to believe that he must withdraw from the firm under any conditions they might impose; that under this pressure he was forced to retire from the firm, receiving a due bill for $10,000, $8,000 of his interest in the firm being retained to cover the falsely alleged deficiencies, and the current year's business was to be settled and the profits divided; that his share of the profits was in excess of the amount he had drawn; that after this adjustment, which he had submitted to, he was made the subject of another fraudulent conspiracy on the part of the defendants to deprive him of half the amount of the due bill and his share of the profits of 1875; that in pursuance of said conspiracy, when he presented the due bill for payment, it was refused, and he was told that under advice of counsel they had resolved to prosecute him criminally; that these representations were false and untrue, and so known by defendants, as they had been advised differently; that under the pressure of these threats, he was compelled to surrender the due bill, receiving but $5,000; that his share of the profits for 1875 had not been paid to him; and that the knowledge of the fraudulent conspiracy had just come to him.

He therefore prayed that an account should be stated of the partnership dealings; that payment be decreed to him of all sums found to be due him; that the $5,000 balance of the due bill be decreed to be paid him; that his share of the profits of 1875 be paid him; and further relief.

The defendants answered that prior to September 11, 1875,

they discovered that the plaintiff had falsified his accounts, made false entries in the books and omitted to charge himself with moneys received, and he had been informed of the discoveries; that in consequence of their discoveries and under the advice of counsel it was agreed between the plaintiff and defendants to dissolve the firm, and a notice to that effect was signed and advertised on September 30, 1875; that a written agreement was also executed by plaintiff and defendants on September 14, 1875, whereby the plaintiff sold defendants his entire interest in the firm; that accounts were submitted to plaintiff from the books, and he admitted the error complained of; that they subsequently discovered additional discrepancies, of which the plaintiff was notified and which he admitted; that all matters of business relating to the firm were settled between the plaintiff and defendants prior to November 24, 1875; that they made him a final payment, and obtained from him a written release under seal, dated November 23, 1875, of all claims against the late firm and the defendants individually—since the execution of which they had had no business relations with the plaintiff. They, therefore, answered that their further defense was the statute of limitations, and prayed to be dismissed, etc.

The master, William F. Johnson, Esq., found the following facts:

Iredell, the plaintiff, entered into partnership with the defendant, William G. Klemm, about 1867, to conduct the furnishing goods and notion business in Philadelphia, under the firm name of Klemm & Iredell. In 1872 the defendant, John Klemm, was admitted as partner, the firm name remaining unchanged. Iredell kept the books, and the Klemms did most of the buying and selling. The profits were equally divided.

In August, 1875, while Iredell was taking his vacation, the other partners employed an expert accountant to examine the books of the firm. This expert found that Iredell had made incorrect entries, by which it appeared that he had appropriated the money of the firm to a greater amount than he was entitled to draw out by the partnership agreement. He appeared to have thus improperly taken somewhere between $2,800 and $3,200. The exact amount was not shown by the proof. On

finding these inaccuracies in the books, the defendants consulted counsel, the late J. Gordon Brinckle, who advised the defendants that Iredell had committed no crime, but that they had better dissolve the firm; and Mr. Brinckle thereupon prepared an agreement of dissolution. On Iredell's return to the city, the defendants called him aside, told him of the inaccuracies in the books and at once produced the agreement of dissolution, which Iredell executed. A day or two later, Iredell agreed to take $10,000 for his interest in the firm, to be paid in instalments. This agreement was put in writing and executed under the seals of the parties September 14, 1875, and a due bill for the $10,-000 was given to Iredell.

In October, 1875, Iredell received $3,000 on account of the due bill. With this money he opened a store near the defendants and in the same line of business with them. This greatly incensed the Klemms. They at once determined to punish Iredell for thus attempting to compete with them in business, and concluded not to pay the balance of the due bill held by him. William G. Klemm then met Iredell and falsely told him that they had discovered discrepancies in their books in addition to those of which they were informed at the time the $10,000 due bill was given, and demanded the immediate surrender of the due bill. William G. Klemm followed this up by sending the expert, who had remained with the Klemms as their bookkeeper, to Iredell, to compel the surrender by threats of immediate arrest, and to falsely tell him that they had been advised by counsel that they could put him in the penitentiary, and that he was in serious and imminent danger of being convicted of embezzlement. Iredell called upon the defendants at once. They repeated the false statements and threats, and so deceived and frightened Iredell that he agreed to surrender the due bill. The defendants at once produced a release, previously prepared, and Iredell signed it. After the paper was signed, William G. Klemm promised to give Iredell $2,000. This he subsequently did, with a note at sixty days, which was paid at maturity.

Iredell thus received $3,000, and subsequently $2,000 from the defendants on account of the due bill for $10,000, and was by their fraud deprived of his interest in a lucrative business worth on the day the due bill for $10,000 was signed, at least $18,000. By reason of failing to pay their due bill, the de-

fendants compelled Iredell to retire from the business in which he had started.    The first knowledge Iredell had of the conspiracy was derived from the expert, immediately before this bill was filed, in November, 1882.

The master reported a decree for the plaintiff in accordance with the prayer of the bill.

The defendants filed, *inter alia,* the following exceptions, alleging that the master erred: (2) In not finding as a material fact in the case, that the plaintiff had placed the due bill in the hands of his counsel, J. Alexander Simpson, for collection; that he informed Mr. Simpson of the threats, and that, after the interview at the store, he got this due bill from Mr. Simpson and delivered it to the defendants; (5) in reporting that the note was not given in consideration of the release; (13) in reporting that the plaintiff and defendants were copartners, and an altogether different measurement of their conduct towards one another is demanded, than that measurable of the conduct of men dealing at arm's length; (14) in finding that any influence was exerted by the defendants upon the plaintiff, which constituted duress, or which prevented the plaintiff from being a free agent, and not equal to protecting himself when surrendering the due bill, giving the release and receiving in consideration thereof from the defendants their note for $2,000; (17) in finding that the release was no deed and valueless in the possession of anyone seeking to enforce it, and that the defendants could not avail themselves of any protection that might otherwise be derivable from it; (22) in not finding that the plaintiff's right to recover was barred by the surrender of the due bill and the delivery of the release; (23) in reporting that there should be a decree in favor of the plaintiff; that the deed of release should be avoided and set aside, and be delivered up to be canceled and forever annulled; (24) in not finding as a fact that the defendants were guiltless of a conspiracy to deprive the plaintiff of one half of his $10,000 due bill as averred in the bill, there being no evidence of such a conspiracy between the defendants, and the testimony of the plaintiff's witness positively denying such a conspiracy; (30) in reporting that the defendants should be ordered and decreed to pay unto the plaintiff the sum of $5,000, with interest thereon from September 14, 1875, to wit, the ag-

gregate sum of $7,750; and (31) in not reporting that the bill should be dismissed at the cost of the plaintiff.

The court below sustained the exceptions quoted, and REED, J., delivered the following opinion:

No benevolent exercise of equity power can under the law save the plaintiff in this case from the unhappy consequences of his own deliberate acts. The eloquence, too, and kindly sophistry of the master do not convince. And the plaintiff, who had secretly wronged his firm by taking money from the common fund beyond that to which he was entitled, and by making false entries in the books to conceal this, who, when detected, made his peace with his partners, who not unaided by professional advice entered into a later compact with them and accepted the money which his agreement called for, and who then let seven years go by without a protest, cannot now demand a chancellor's help to reinstate him under the earlier and to him more favorable contract which was quite done away with by the later one. A suitor, himself so culpable, must make out against the defendants a case of oppression and late discovered conspiracy of a serious character and by irrefutable evidence very different from anything appearing before us here. The conduct of the defendants, whether or not it was ungenerous, was not unjust; and had it been so the plaintiff was precluded from availing himself of the other's wrong.

The second, fifth, thirteenth, fourteenth, seventeenth, twenty-second, twenty-third, twenty-fourth, thirtieth, and thirty-first exceptions are sustained, and the bill dismissed, at the costs of the plaintiff.

The assignments of error specified substantially the action of the court below in sustaining the exceptions and dismissing the bill.

*William W. Porter, Edward Willard,* and *Edward Willard, Jr.,* for appellant.—The facts proven in the cause disclose fraud on the part of the defendants. No authority need be submitted showing that this court has equity jurisdiction in cases of fraud. Here the plaintiff claims that, through the fraud of the defendants, he was induced to surrender for nothing a due bill upon which $7,000 were yet unpaid. This en-

titles the plaintiff to a decree. Robins v. Kitchen, 8 Watts, 390; Whelen's Appeal, 70 Pa. 425; Harris v. Tyson, 24 Pa. 360, 64 Am. Dec. 661; Ferris v. Henderson, 12 Pa. 49, 51 Am. Dec. 580; Abrahams v. Hunt, 26 Pa. 49.

Here the relation subsisting between the plaintiff and the defendants was such that the plaintiff was in a position to be easily deceived by them.

Constructive fraud often exists where the parties to the contract have a special, confidential, or fiduciary relation which affords the power and means to one to take undue advantage of or exercise undue influence over the other; wherever, from such relation, considerable authority or influence necessarily exists on the one side, and a corresponding reliance and confidence is placed on the other, a party will not be suffered to abuse this authority or influence by extracting any advantage to himself. Darlington's Appeal, 86 Pa. 512, 27 Am. Rep. 726.

Equity not only watches over those defined relations of parties, but it scrutinizes the undefined relations of friendly habits of intercourse, personal reliance, and confidential advice. It is well known that habits of kindness, confidence, and trust grow between neighbors and friends; and if advantage is taken of such relations to obtain an unfair bargain, equity will set it aside or convert the offending party into a trustee. Perry, Tr. par. 210.

The plaintiff never became aware of the fraud that had been practised upon him until a short time before the bill in the cause was filed. The statute does not begin to run until the discovery of the fraud. Ferris v. Henderson, 12 Pa. 49, 51 Am. Dec. 580; Rush v. Barr, 1 Watts, 110; Pennock v. Freeman, 1 Watts, 401; Mitchell v. Buffington, 10 W. N. C. 361.

*Mayor Sulzberger* and *Henry W. Dechert,* for appellees.— The statute of limitations is applied with the same effect in a court of equity as in a court of law. Hamilton v. Hamilton, 18 Pa. 20, 55 Am. Dec. 585; Bank of United States v. Biddle, 2 Pars. Sel. Eq. Cas. 31; Randel v. Ely, 3 Brewst. (Pa.) 270; Todd's Appeal, 24 Pa. 429.

A court of equity will not grant relief where the statute of limitations has run against the plaintiff's claim, after a complete cause of action has accrued. Waterman v. Brown, 31 Pa. 161.

In the absence of evidence the answer must be taken as true. Paul v. Carver, 24 Pa. 211, 64 Am. Dec. 649.

Against the responsive denial of defendants this would, according to the practice in equity, require two witnesses, or one witness and strong corroborative circumstances. Pusey v. Wright, 31 Pa. 394; Eberly v. Groff, 21 Pa. 251; Bank of United States v. Beverly, 1 How. 134, 11 L. ed. 75; Audenreid's Appeal, 89 Pa. 114, 33 Am. Rep. 731.

The rule is that a chancellor invariably refuses to decree on the uncorroborated testimony of a single witness. Brawdy v. Brawdy, 7 Pa. 157; Phillips v. Meily, 15 W. N. C. 227.

Here there was only one witness—the plaintiff.

There are no facts in this case which bring it within the doctrine of *duress per minas,* or of any kind as defined by this court.

The constraint which takes away free agency and destroys the power of withholding assent to a contract must be one which is imminent and without immediate means of prevention, and such as would operate on a person of reasonable firmness of purpose. Miller v. Miller, 68 Pa. 486; Wharton, Contr. 199, § 148.

A threat to withhold payment of a debt, or refuse performance of a contract, or to do an injury which may at once be redressed by legal process, is not *duress per minas.*

A misrepresentation of a matter of law does not constitute fraud at law, because the law is presumed to be equally within the knowledge of all the parties. Kerr, Fraud & Mistake, 90, 184, 185.

The intervention of an independent third party or adviser is an important ingredient in showing the fairness of a transaction. Cooke v. Lamotte, 15 Beav. 240.

If a solicitor be employed, there is always strong prima facie evidence that the party for whom he was acting knew the nature of the transaction; in all cases where an independent legal adviser or solicitor is employed, the evidence that everything that was necessary to be known had been brought to the knowledge of his employer would be conclusive. De Montmorency v. Devereux, 7 Clark & F. 188.

Per Curiam:

This is not a case for the equitable interference of the court;

and if it were, the lapse of time is an effectual bar to the plaintiff's claim.

The decree is affirmed and appeal dismissed, at the costs of appellant.